UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **WILLIAM V. TRAN**<br>**11831 Tulip Stern Drive**<br>**Clarksburg, MD 20871**<br><br>*Plaintiff*,<br><br>v.<br><br>**XAVIER BECERRA, Secretary**<br>**U.S. Department of**<br>**Health and Human Services**<br><br>*Defendant.*<br><br>Serve:<br>**Christina Patton Black, Esq.**<br>General Law Division<br>Office of General Counsel<br>Department of Health & Human Services<br>330 C Street SW, Suite 2600<br>Washington, D.C. 20201 | **Case No.:** 8:23-cv-00495-PX<br><br><br>**JURY TRIAL DEMANDED** |

## AMENDED COMPLAINT

COMES NOW, Plaintiff, William Tran (hereinafter "Plaintiff" or "Mr. Tran"), by and through his undersigned counsel Dionna Maria Lewis, Esq. complains against Defendant, United States Department of Health and Human Services (hereinafter "Defendant" or "HHS") and in support thereof states as follows:

### INTRODUCTION

1. This action is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000(e), *et seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA") for the Defendant's unlawful harassment,

1

discrimination, and non-selection based on age, and retaliation against the Plaintiff.

## JURISDICTION AND VENUE

2. This Honorable Court has subject matter jurisdiction over this suit pursuant to 28 U.S.C. § 1331as it asserts a claim that arises under the Constitution, laws, or treaties of the United States, specifically Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000(e) *et seq.*, and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA"), to redress and enjoin employment practices of the Defendant.

3. This Honorable Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1343.

4. Venue is appropriate because a substantial part of the actions complained of are the result of actions and employment practices of Defendant, which operates in Maryland.

5. Additionally, venue is proper in the District of Maryland Court pursuant to 28 U.S.C. §§ 1391(b) and (e) because a substantial part of the wrongful conduct complained of herein occurred in this District, Defendants transact substantial business in this District, and Defendants maintain employment records related to this action in the District of Maryland.

## EXHAUSTION OF REMEDIES

6. Plaintiff has exhausted all of his administrative remedies.

7. Plaintiff filed a complaint with the Baltimore Field Office of the U.S. Equal Employment Opportunity Commission (EEOC) on or about June 3, 2016, alleging harassment, discrimination, and non-selection based on age and retaliation.

8. On July 26, 2021 after Plaintiff's request, the EEOC issued Plaintiff a Right-to-Sue Letter, which Plaintiff received on July 27, 2021.

9. Accordingly, Plaintiff timely files this action in accordance with the Notice of Right to Appeal, which provided Plaintiff the right to file this Complaint within 90 days of receipt of

the Notice.

## NATURE OF THE ACTION

10. Plaintiff brings this action to secure protection of rights granted under the statute mentioned above, to redress deprivation of rights thereunder, and to obtain such other relief as is necessary to redress the injury to Plaintiff resulting from Defendant's violation of those statutes.

11. Plaintiff's damages are significant, including, but not limited to, the loss of reputation, career advantage, a violation of privacy, emotional tranquility, and denial of his constitutional and statutory rights.

12. The action seeks declaratory and injunctive relief, as well as compensatory and punitive damages, both to secure future protection and to redress the past deprivation of rights guaranteed to named Plaintiff.

## PARTIES

13. Plaintiff, William Tran is a Vietnamese-Asian male over the age of forty (40) (DOB: 1968) who resides in Clarksburg, Maryland, where he currently works for the National Institute of Health ("NIH").

14. Defendant is a governmental agency, which is headquartered in the District of Columbia.

15. Plaintiff was employed as a Mechanical Engineer for the NIH for over ten (10) years and primarily worked at the NIH building in Bethesda, Maryland.

16. During the relevant period, Defendant employed Plaintiff, William Tran.

17. During the relevant period, Plaintiff was Defendant's employee within the meaning, and entitled to the protections of Title VII and the ADEA.

## FACTUAL ALLEGATIONS

18. Plaintiff contends that the Defendant discriminated against him based on age and engaged in non-selection for various employment positions because of his age and in retaliation for his protected EEO activity.

19. Plaintiff is a Vietnamese-American male over the age of forty who has been employed by the federal government for over ten (10) years. Prior to working for the National Institute of Health, Plaintiff worked for the Department of Defense for approximately one and a half years. Prior to his EEO grievances, Plaintiff consistently received "exceptional" annual performance ratings, both at the Department of Defense and National Institute of Health. However, after he began to engage in protected activity, that all changed.

20. Plaintiff has a Bachelor of Science in Mechanical Engineering and has held a HVAC Contracting License since early 1993. Plaintiff has also owned and operated an HVAC consulting business.

21. Despite Plaintiff's qualifications, Plaintiff has repeatedly been denied career opportunities at NIH in favor of less-qualified younger individuals. Even in the face of obvious disparate treatment, Plaintiff actively attempted to reach out to Defendant's senior leadership to seek career advancement opportunities and trainings, to no avail.

22. After Plaintiff's attempts to advance in his career, Defendant's management instructed Plaintiff to perform unskilled labor task-inventory. Plaintiff was the only employee who held the status of engineer in Defendant's organization, yet he was directed to perform duties outside of his job description, which were typically reserved for less qualified individuals who would ordinarily perform unskilled tasks.

23. Additionally, Plaintiff was tasked with supervising a difficult employee even though this was outside of his job duties and was seemingly aimed at making Plaintiff's work life more

difficult. Based on reason and belief, this was done in an effort to retaliate against him and create a hostile working environment for him. As a result, Plaintiff began to document the numerous instances of discrimination he faced.

24. On or about April 22, 2015, Mr. Guan sent Plaintiff an email stating that he would be responsible for supervising and training an employee, Mr. Victor Camello. However, Mr. Tran's job responsibilities did not include supervisory duties and his job description or compensation was never updated to reflect this change or these expanded duties.

25. Between April 22, 2015 and June 10, 2015, Plaintiff wrote numerous emails to Mr. Guan and Mr. Joe Nieves in regard to Mr. Camello's hostile behavior towards him. Mr. Camello had displayed violent bursts of anger towards Plaintiff and other coworkers and Plaintiff was concerned for his and others' safety in the workplace. Management did not take any action to address Plaintiff's concerns despite the genuine fear that Plaintiff conveyed.

26. On or about February 6, 2015, Plaintiff was constructively demoted when his job duties were changed from a practicing engineer to those of an unskilled laborer when he was assigned to an "Inventory Administrator" position, and given the task of organizing the inventory cage. Once again, there was no change in Plaintiff's position classification as required by the Office of Personnel Management (OPM) nor was a new SF-50 issued to reflect the new job responsibilities.

27. When questioned during the EEOC investigation as to who was responsible for deciding Plaintiff's new job responsibilities, Mr. Nieves stated that Plaintiff's reassignment was made by Ms. Alamelu Ramesh. However, Ms. Ramesh stated that while she was aware of the changes in Plaintiff's responsibilities, she was not involved. Defendant's EEOC interrogatory answers stated the new job responsibilities were "part of his existing position as a General Engineer," however, Plaintiff was actually the only engineer required to

perform these tasks.

28. Plaintiff made clear to management that the inventory tasks did not utilize his professional skills and from February 12, 2015 to April 19, 2016, he inquired for other opportunities that were affiliated with his skills and experience. Being singled out, Plaintiff was the only engineer being required to work inventory tasks and management took no action to rectify the situation. Based on reason and belief, senior management continued to show preference for younger and less-qualified employees.

29. In or around December 2015, Plaintiff learned that a position he had previously expressed interest in had been cancelled but was later filled by a less qualified individual. The Maintenance Supervisor position was never competitively announced and was filled by NIH outsider-Mr. Dax Sadler.

30. On or about February 19, 2016, Mr. Alex Huang, Plaintiff's younger coworker, stated during a morning meeting that he was referred to a Mechanical Engineer position in Durham, North Carolina. The position had been posted on or around early February 2016 and interviews had not yet been conducted with other potential candidates. Despite this, Mr. Huang made it clear that management was planning to bring him on board and to send him to Durham, North Carolina for a few weeks, before ultimately bringing him back to Bethesda, Maryland.

31. Alex Huang was initially brought on board through an employment recruiting services (Ravens) to be under the same supervision as Plaintiff with Mr. Don Guan.

32. On or about February 25, 2016, Plaintiff went out to lunch with Mr. Huang and another coworker. At this lunch, Mr. Huang stated that management would hire Mr. Huang in a way that would look "legitimate." Mr. Huang told Plaintiff that this meant his temporary stay in Durham would be one month or up to three months and that "it's all timing" on how

the second position would be put out to support Mr. Huang's temporary stay in Durham, or words similar.

33. On or about March 8, 2016, Mr. Huang reiterated to Plaintiff and another coworker that interviews for the position were now taking place, but that management would ultimately hire Mr. Huang in the end. Then, on or about March 20, 2016, Mr. Huang informed his coworkers that he was scheduled for a phone interview for the position. In response, Plaintiff questioned Mr. Huang as to what would happen to one of their other coworkers, Mr. Kayvan Torkashvan. Mr. Huang responded that management would try to hire Mr. Torkashvan through another avenue, but that it would be difficult because Mr. Torkashvan did not have an engineering degree.

34. On or about March, 27, 2016, Mr. Huang informed Plaintiff and a coworker that he had received an official hiring call from Human Resources to extend a job offer for the position in Durham, NC. On or about April 12, 2016, Mr. Huang informed Plaintiff and another coworker that his starting date for his new position would be May 2, 2016. Mr. Huang also informed Plaintiff that he and his wife had recently put in a bid for a new home in Bethesda *after* he received a tentative offer in Durham, and that they would be moving on or about May 13, 2016.

35. On or about April 27, 2016, Mr. Huang indicated to Plaintiff that management agreed to detail him back to the NIH main campus in Bethesda after a few weeks stay in Durham. Mr. Huang informed Plaintiff that he would be renting an extended stay hotel room while in Durham for orientation, or words similar.

36. As these events were occurring, Plaintiff found it odd that Mr. Huang had advance notice that he would receive the job offer in March 2016, and place a bid on a new home in Bethesda in April 2016. The job posting was clearly for Durham, North Carolina and

7

Plaintiff found it suspicious that Mr. Huang would be "working" in Durham, NC, but living in Bethesda, MD.

37. Throughout the course of these events, Plaintiff wrote five (5) emails between February 12, 2016 and April 19, 2016 to management members, Ms. Ramesh, Mr. Guan, Mr. Nieves, Mr. Mayberry, and Mr. Vergara. Plaintiff pleaded for other career opportunities after he was assigned job responsibilities from Mechanical Engineer to unskilled labor tasks, such as inventory which was an affront to his background and experience.

38. Plaintiff realized that management was orchestrating hiring opportunities for less-qualified individuals such as Mr. Huang and Mr. Torkashvan, but never responded to any of Plaintiff's emails for similar opportunities. It became clear that preference was being given younger, less-qualified candidates and those who had not engaged in protected activity.

39. Plaintiff was also denied the ability to telework by Mr. Don Guan when it was offered to other employees. During the EEOC investigation, management denied this, but Plaintiff's coworker, Mr. Amir Abdelsalam attested to the fact that Plaintiff had inquired for the ability to telework but was denied the opportunity.

40. Further, Plaintiff was denied training opportunities that were made available to other younger employees and those who had not engaged in protected activity. Central Utility Plant (CUP) management had scheduled numerous on and off-site trainings for engineers in an effort to enhance employee professional careers. Engineers would have a chance to travel offsite, attend conferences, and train in-house with new equipment. Despite Plaintiff's ten-year career at NIH, Plaintiff was never invited to these trainings. Once again, Plaintiff noticed younger, less-qualified employees and those who had not engaged in protected activity received these opportunities instead.

41. On or about April 19, 2016, Plaintiff was not considered to serve as Acting Chief. During

the EEOC investigation, Defendant's management was questioned about its reasoning for this. Both Ms. Ramesh and Mr. Farhad Memarzadeh stated that a GS-13 grade employee would not be the Acting Branch Chief because a GS-13 could not manage a GS-14. This would have been sound reasoning had Plaintiff not been aware that Mr. Guan had been made Acting Utility Engineer Branch Chief when he was a GS-13 on or about October 24, 2014. Shortly afterwards, Mr. Guan officially became a Branch Chief, but management did not want to award Plaintiff the same opportunity as a result of his age and protected activity.

42. On or about, April 26, 2016, Plaintiff was also not considered to serve as the Maximo Administrator. Since October 2014, Plaintiff had been involved with Maximo Software when the Division of Technical Resource went through reorganization. Further, on or about February 6, 2015, Mr. Guan had sent an email to Mr. Leo Gumapas asking him to invite Plaintiff to all future Maximo meetings. Ultimately, Mr. Andy Vergara sent an official email to announce Mr. Eric Wisehart as the new Maximo Administrator.

43. Based on information and belief, Mr. Wisehart has a criminal history who had initially been hired as a "High Voltage Shop Leader." Mr. Wisehart finished a six-year prison term on September 2015 for crimes of dishonesty including "racketeering and theft charges," but was still hired as a GS-13 employee without a college degree.

44. Defendant's management claimed that no one was aware of Mr. Wisehart's felony conviction, but that Mr. Wisehart did not hide his record from the agency. Plaintiff found it suspicious that Human Resource Personnel did not know Mr. Wisehart had a felony conviction, unless Mr. Wisehart had lied on his application.

45. During one of the morning coffee breaks, Plaintiff had with his coworkers, Plaintiff engaged in what became a heated argument with Mr. Huang regarding the competency of Senior Management. Mr. Huang disagreed with Plaintiff's comments that taxpayer

9

money was being wasted.

46. On or about May 3, 2016, Plaintiff was called into a meeting with Ms. Alamelu Ramesh, Deputy Director, and Mr. Dan Moses, Branch Chief. Plaintiff was informed that his inventory work duties were being removed and that there was no need for him at the CUP plant anymore. Plaintiff inquired as to why newly hired mechanical engineers with no experience were not being detailed to other areas and Ms. Ramesh responded that if Plaintiff was unhappy, he "should look for another job," or words similar. Plaintiff believes that this action and these comments by Ms. Ramesh were in retaliation for his comments about Senior Management during his heated conversation with Mr. Huang.

47. At a later instance, Mr. Huang suggested to Plaintiff's coworker, Mr. Abdelsalam, that Plaintiff's reassignment to inventory was due to Senior Management's dissatisfaction with Plaintiff. Mr. Abdelsalam then relayed this to Plaintiff.

48. Further, on or about April 11, 2016, chain emails between Ms. Ramesh, Mr. Nieves, Mr. Bill Topper and Plaintiff were sent to request an inventory "Labor Contract" extension. Ms. Medlin, Contracting Officer, confirmed the extension. However, three weeks later, Plaintiff was informed that the inventory task was coming to a close. The fact that the contract had been extended and three weeks later, *after* a heated argument about senior management, Plaintiff was informed he was being reassigned made Plaintiff realize that his reassignment was retaliatory in nature.

49. On or about June 7, 2016, Plaintiff learned that he was denied a cash or time off bonus award while some of his colleagues with lower annual performance ratings received awards. This was the second time this had occurred to Plaintiff. The previous occurrence was in 2011 when one of Plaintiff's colleagues had received a Quality Step Increase and higher Cash Award with a rating of approximately around 4-4.5. Plaintiff received an

"exceptional" rating of 5 that same year and did not receive a Quality Step Increase.

50. On or about August 26, 2016, Plaintiff filed an incident case report with Officer Tart Dickerson at NIH Police Department. On or about August 30, 2016, NIH Detective David Warren reached out to Plaintiff by phone and told him that he would not get involved with his case because Plaintiff was in the middle of EEO complaints. Plaintiff pleaded with Detective Warren to conduct the investigation because the EEO complaints would take some time and Plaintiff was worried for his safety. Plaintiff never received a police incident report or a case number and never signed any document or had the opportunity to present his case to Detective Warren. However, Plaintiff later found out that an unsigned police incident report was provided to the EEO office and NIH HR during the EEOC investigation without his knowledge even though he had not been able to obtain the same, despite his requests.

51. On or around November 2016, Plaintiff was not selected for a Supervisory Engineer position. Defendant's management claimed that Plaintiff was not selected because he lacked a FAC- PPM certification and the candidate needed to have knowledge of the CUP. However, management controls who receives a FAC-PPM certification and Plaintiff had direct professional certifications with a degree in Mechanical Engineering, an HVAC license, project management, previously owned and operated a HVAC consultant business, and had worked directly with utility facilities. By contrast, Mr. Marty Haghjou, who was selected, was a civil engineer who worked with bridges and roads and not utility facilities.

52. The interview panel for the Branch Chief position included Mr. Guan (mechanical engineer), Mr. Steve Breslin (architect), and Mr. Gregory Gendron (journalist). At least two out of three of the interviewers did not have project management skills or direct field experience in a utility plant. Additionally, one out of the three individuals were a part of

Plaintiff's EEO ongoing EEO case and Plaintiff felt that they were deliberately giving him lower interview scores in retaliation for his EEO case.

53. Finally, in or about 2018, Plaintiff learned that Mr. Haghjou had been moved to a different position and that his replacement, Mr. Abdul Bhuiyan, is an electrical engineer who had never been a project manager and has never held any project management certification. As such, the Supervisory Engineer position that Plaintiff was not selected for, allegedly because he did not have project management skills or knowledge of the CUP, is now occupied by an individual who does not have project management skills or knowledge of the CUP.

54. Based on reason and belief, Plaintiff was discriminated against when he was continuously passed over for promotions, demoted, and replaced by an ex-convict despite the fact he had consistent excellent annual performance ratings and was well qualified for the positions.

55. As a result of this harassment and discrimination, Plaintiff has been gravely impacted with regards to his employment and resulting emotional distress.

## COUNT I

### VIOLATION OF THE ADEA – AGE DISCRIMINATION

56. The ADEA prohibits an employer from "discharg[ing] any individual or otherwise discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). The plaintiff "must prove, with reasonable probability, that but for the age of the plaintiff, the employment decision adverse to the plaintiff would not have been made." *Duke v. Uniroyal Inc.*, 928 F.2d 1413, 1417 (4th Cir. 1991).

57. A *prima facie* case of age discrimination requires a showing of four (4) elements: that he (1) was protected by the ADEA, (2) suffered an adverse employment action, (3) "was

performing his job at a level that met his employer's legitimate expectations" at "the time of the adverse employment action, and (4) was replaced by a substantially younger worker." *Ullrich v. CEXEC, Inc.*, 233 F. Supp. 3d 515, 525 (E.D. Va. 2017).

58. Here, the four (4) elements of a *prima facie* case of age discrimination are met. Plaintiff is over forty years old and is considered a member of a protected class pursuant to the ADEA. Plaintiff is a qualified employee and suffered adverse employment actions directly related to his membership in a protected class pursuant to the ADEA, when he was constructively demoted, given changes in duties and assignments outside of the scope of his job description, and not selected for promotions and denied of awards, trainings, and telework opportunities. Finally, Plaintiff has identified younger similarly situated employees of Defendant who were treated more favorably than Plaintiff, giving rise to an inference of disparate treatment.

59. The work environment and adverse action that Plaintiff was subjected to materially affected the terms, privileges, and conditions of his employment.

60. Defendant knew that Plaintiff was over the age of 40 prior to the adverse actions described throughout the Complaint and was aware, or should have been aware, of the discrimination Plaintiff was subjected to because of his age.

61. Plaintiff has been treated differently and subjected to different terms and conditions of his employment due to his age.

62. Defendant treated Plaintiff in a way that adversely affected his status as an employee because of his age.

63. Similarly situated younger employees have been treated more favorably than Plaintiff with regards to the terms and conditions of employment and workplace conditions.

64. Plaintiff's age was a determining factor in Defendant's unlawful conduct toward Plaintiff.

65. Plaintiff's age was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

66. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

67. Defendant's aforementioned conduct has been intentional, deliberate, willful, malicious, reckless, and in callous disregard of the rights of Plaintiff because of his age.

68. Defendant discriminated against Plaintiff because of his age by engaging in, tolerating, or failing to prevent age discrimination and by failing to take affirmative action to correct and redress the unlawful employment practices perpetrated against Plaintiff.

69. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants, and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

70. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury, and monetary damages – including, but not limited to, past and future loss of income, benefits, career opportunities, and costs – and is entitled to all available legal and equitable remedies.

71. Plaintiff was humiliated, embarrassed, and made to endure a great amount of pain and suffering, and his injury is permanent in nature.

72. Plaintiff has incurred lost wages, loss of reputation, defamation of character, and loss of career opportunity now and into the future, and all of the other losses stated with Plaintiff not contributing in any way thereto.

73. Similarly situated younger employees were not subjected to the same, similar, or any adverse treatment as Plaintiff.

74. By law, Defendant must comply with the ADEA, but through its conduct has violated the ADEA.

## COUNT II

## VIOLATION OF THE ADEA – RETALIATION

75. Plaintiff incorporates all information and allegations contained in the preceding paragraphs as if fully set forth herein.

76. The ADEA forbids an employer from retaliating against an employee for engaging in protected activity, such as making a charge of age discrimination or opposing a practice made unlawful by the ADEA. 29 U.S.C. § 623(d).

77. Here, the Plaintiff faced retaliation for his prior EEO activity.

78. Soon after engaging in protected activity, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of the ADEA.

79. Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendant and its agents in violation of the ADEA.

80. Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his informal and formal complaint filings.

81. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

82. Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

83. Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

84. Similarly situated employees (no known prior EEO activity) were not subjected to the same, similar, or any adverse treatment.

85. Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of the ADEA.

86. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

87. Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

88. Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

89. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

90. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

## COUNT III

### VIOLATION OF TITLE VII – RETALIATION

91. Plaintiff re-alleges and incorporates by reference each and every allegation in the paragraphs above, as if fully set forth herein.

92. Title VII of the Civil Rights Act prohibits an employer from "discriminat[ing] against any

individual with respect to [his] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin," 42 U.S.C. § 2000e– 2(a)(1), and from retaliating against employees for engaging in activity protected by Title VII, *id.* § 2000e–3(a). To that end, an employer may not create or condone a hostile or abusive work environment that is discriminatory. *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 64–65 (1986).

93. Here, the Plaintiff faced retaliation for his prior EEO activity.

94. Soon after engaging in protected activity, Plaintiff was subjected to the unlawful conduct and adverse actions alleged throughout this Complaint in violation of Title VII.

95. Defendant subjected Plaintiff to the aforementioned adverse employment actions because of his opposition to the unlawful and discriminatory employment practices of Defendant and its agents in violation of Title VII.

96. Defendant, including Plaintiff's supervisors, knew of Plaintiff's engagement in protected activity prior to engaging in the aforementioned adverse actions when they were informed by Plaintiff directly, advised by an EEO representative, or otherwise should have known that Plaintiff engaged in the complaint process based on his informal and formal complaint filings.

97. The adverse retaliatory actions to which Plaintiff has been subjected to are a direct result of Plaintiff having previously engaged in statutorily-protected activity.

98. Plaintiff's prior protected activity was a determining factor in Defendant's unlawful conduct toward Plaintiff.

99. Plaintiff's prior protected activity was a motivating factor in Defendant's unlawful conduct toward Plaintiff.

100. Similarly situated employees (no known prior EEO activity) were not subjected to

the same, similar, or any adverse treatment.

101. Defendant's unlawful conduct has created a climate of fear and isolation for Plaintiff and other employees, which creates a chilling effect in violation of Title VII.

102. The reasons proffered by Defendant for its unlawful conduct are pretextual and Defendant cannot further offer any legitimate reason for its unlawful conduct.

103. Defendant's unlawful conduct negatively impacted the terms, conditions, and privileges of Plaintiff's employment.

104. Defendant's retaliatory conduct has been intentional, deliberate, willful, malicious, reckless and in callous disregard of the rights of Plaintiff because of his participation and opposition to Defendant's discriminatory conduct.

105. Defendant is directly liable for the discriminatory acts or omissions of its agents, servants and employees while acting within the course and scope of their employment, under the theory of *Respondeat Superior*.

106. As a direct and proximate cause of Defendant's conduct alleged throughout this Complaint, Plaintiff suffered and continues to suffer from harm, injury and monetary damages – including but not limited to past and future loss of income, benefits, career opportunities, medical expenses and costs – and is entitled to all available legal and equitable remedies.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff, Mr. William V. Tran, respectfully prays that this Court grant him the following relief:

a. Enter a declaratory judgment finding that the foregoing actions of Defendant violated Title VII and the ADEA;

b. Enter a permanent injunction directing Defendant to take all affirmative steps

necessary to remedy the effects of the illegal, discriminatory conduct described herein and to prevent similar occurrences in the future;

    c.    Award compensatory damages in the amount of $750,000 that would fully compensate Plaintiff for the economic loss, loss of promotional potential, reputation, lost wages, lost job benefits, physical and psychological injury, humiliation, embarrassment, and mental and emotional distress caused by the conduct of the Defendant alleged herein;

    d.    Award Plaintiff reasonable attorneys' fees and costs incurred in this action; and

    e.    Order such other relief as this Court deems just and equitable.

## JURY DEMAND

Plaintiff demands a trial by jury of all issues so triable herein.

Dated: August 15, 2023

Respectfully submitted,

*/s/ Dionna Maria Lewis*

_____

Dionna Maria Lewis, Esq.
District Legal Group, PLLC
Bar No. 19486
700 Pennsylvania Ave, SE, Suite 2098
Washington, D.C. 20003
Phone: (202) 486-3478
Dionna@DistrictLegalGroup.com
*Counsel for Plaintiff*